UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| RANDY SULLIVAN, | Case No. LACV 16-7015-GW (LAL) |
| Petitioner, | **FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE** |
| v. | |
| DAVIES, Warden, | |
| Respondent. | |

    This Final Report and Recommendation[1] is submitted to the Honorable George H. Wu, United States District Judge, under the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## I.

## <u>PROCEEDINGS</u>

    On September 19, 2016, Randy Sullivan ("Petitioner") filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254 ("Petition"). On April 19,

///

///

///

---

[1] This Court issues this Final Report and Recommendation to correct largely typographical errors. It does not change the analysis or the outcome. Because Petitioner was entitled to file objections to the original Report and Recommendation, Petitioner will not be allotted additional time to object to the Final Report and Recommendation.

1  2017, Respondent filed an Answer to the Petition.[2]  Petitioner did not file a Reply.  Thus, this

2  matter is ready for decision.

## II.

## PROCEDURAL HISTORY

On April 3, 2014, Petitioner was convicted after a jury trial in the Los Angeles County

Superior Court of one count of second degree murder.[3]  (Volume 4 Supplemental Clerk's

Transcript ("SCT") at 683, 685, 796.)  Before sentencing, Petitioner admitted having suffered

prior convictions.  (4 SCT at 793.)  On July 9, 2014, the trial court sentenced Petitioner to a state

prison term of 17 years to life.  (4 SCT at 792-94, 796-97.)

Petitioner appealed his conviction to the California Court of Appeal.  (Lodgments 4-6.)

On November 6, 2015, the California Court of Appeal affirmed the judgment against Petitioner.

(Lodgment 7.)

Petitioner then filed a petition for review in the California Supreme Court.  (Lodgment 8.)

On February 17, 2016, the California Supreme Court denied review.  (Lodgment 9.)

Finally, Petitioner filed a habeas corpus petition in the California Supreme Court.

(Lodgment 10.)  On December 21, 2016, the California Supreme Court denied the petition.

(Answer at 2.)[4]

## III.

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Because Petitioner challenges the sufficiency of the evidence, this Court has

independently reviewed the state court record.[5]  Based on this review, this Court adopts the

---

[2] On January 5, 2017, Respondent filed a Motion to Dismiss the Petition.  On February 1, 2017, Respondent filed a supplement to the Motion to Dismiss requesting to withdraw the motion in light of Petitioner's exhaustion of state court remedies.  The previous magistrate judge granted Respondent's request to withdraw the motion on the same day.

[3] Cal. Penal Code § 187(a).

[4] Respondent did not provide this Court with a copy of the California Supreme Court's order denying the habeas petition and does not include a citation to such an order in the Answer.  However, this Court has verified on the state courts' website that the California Supreme Court summarily denied Petitioner's habeas petition on December 21, 2016.  This Court takes judicial notice of the state courts' records pursuant to Rule 201 of the Federal Rules of Evidence.  See Harris v. County of Orange, 682 F.3d 1126, 1131-32 (9th Cir. 2012) (under Rule 201 court may take judicial notice of undisputed matters of public record including documents on file in federal or state courts).

[5] See Jones v. Wood, 114 F.3d 1002, 1008 (9th Cir. 1997).

factual discussion of the California Court of Appeal's opinion in this case as a fair and accurate summary of the evidence presented at trial:[6]

On November 29, 2012, Brandon Houston and Ke'ana Moore, Houston's girlfriend and the mother of his infant son, had a heated argument and shoving match. The electricity had been turned off in the Lancaster apartment where they lived and Houston was jealous because he discovered Moore had been texting an ex-boyfriend. Although Moore wanted to leave, Houston did not want her to take the baby away from the house. At trial, one of Houston's sisters testified Houston told Moore he did not want another man coming over to pick up Moore and his son. The sister remembered Moore telling Houston "he was going to get his." Houston walked outside to calm down. Moore called her sister and asked for a ride.

Henderson, Lockett, and Sullivan arrived in a black SUV that Henderson was driving. Henderson and Sullivan are brothers; Lockett is their cousin. Henderson was dating Moore's sister. Houston and his 14-year-old nephew, D.S., were sitting on the steps outside the apartment. The defendants and Houston were all acquainted. Houston had once fought Lockett when they were both in high school.

Upon arriving at the apartment building, Henderson honked the horn. Moore came outside with her baby (Houston's son). Henderson got out of the car and moved the seat so that Moore could get in. Sullivan and Lockett were still in the car. As Moore went to the SUV, Houston told her to wait. When Moore protested, Houston said he wanted to kiss his son.

As Houston was walking away from the SUV, Henderson bumped or pushed him and told him to move. Houston backed up and prepared to hit

---

[6] "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary . . . ." Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (citing 28 U.S.C. § 2254(e)(1)). Thus, Ninth Circuit cases have presumed correct the factual summary set forth in an opinion of the state appellate court under 28 U.S.C. §2254(e)(1). See, e.g., Moses v. Payne, 555 F.3d 742, 746 n.1 (9th Cir. 2009) (citations omitted).

Henderson. D.S. told Henderson: "Don't put your hands on my uncle." Henderson and D.S. "squared up," or prepared to fight. By this time, D.S.'s mother and Houston's sister, Chrishonda Coulter, had joined the group. Either Houston or Coulter told Henderson, "You aren't going to fight him," referring to D.S., "he's 14." Coulter told Henderson that D.S. was not grown, indicating that if Henderson had a problem with D.S., he had a problem with her.

Sullivan got out of the SUV, took off his shirt, and said, "I'm Southside Crip. Where you from?" Sullivan was a self-admitted gang member. Houston responded, "I'm not with that." Coulter said she knew some people from "190," a Crips gang in Carson. Sullivan said, "We don't get along with those, they just killed one [of] us." Houston told Sullivan, "It's not about that. It's about you guys coming to my mom's house being disrespectful." Sullivan shook hands with Houston and said he "had love" for Houston, Moore, and their son. However, Henderson and D.S. were still arguing and Coulter attempted to intervene.

Houston's mother threatened to call the police. Henderson and Sullivan got back into the SUV. As defendants and Moore drove away, Henderson yelled that they would be back. In the car, Sullivan said he needed to call one of his "homies" to tell them he just got into it with someone from 190. He did not call anyone at that time. The defendants dropped Moore off and drove away.

Meanwhile, Houston and D.S. walked to a liquor store. Houston and D.S. encountered some of Houston's friends who had heard Houston was "getting jumped." As Houston and D.S. were talking to the friends, they saw the SUV drive past. Coulter and her sister had joined Houston and D.S. Between 10 and 20 minutes had passed since Henderson said he would be back. D.S. saw Sullivan, Lockett, Henderson, and two other people in the SUV. Lockett was driving. Henderson pointed at Houston's group. The SUV drove in a back alley through a nearby shopping center. D.S. saw the SUV circle the area once, then he lost sight of it. Houston, along with his friends and family, continued walking,

4

only to meet the group from the SUV walking straight over to them. The defendants were accompanied by a fourth man, Denelle Wilson, who some of Houston's group knew as "Baby Frost" or "Jack Frost." Wilson was in a relationship with Henderson's and Sullivan's sister. A fifth man wearing a black hoodie and a yellow or gold shirt lagged behind. No one with Houston recognized the fifth man.

The two groups met. One of Houston's friends, Aaron Chism, knew Henderson and Lockett; they had gone to school together and Chism described them as "homeys." Chism also had seen Sullivan around; they shook hands. Sullivan said, "How do you want to do this?" When D.S. asked what he meant, Sullivan said, "You said you want to fight my brother," referring to Henderson. Henderson said he wanted to fight D.S., but Coulter said she would not allow it because D.S. was underage. Henderson ran up and punched D.S. in the nose. Everyone began fighting. Sullivan was fighting one of Houston's friends. Lockett was fighting Houston.

The fifth man wearing a hoodie was hiding behind a car. He was not fighting anyone. Suddenly, he left his position by the side of a car and approached the middle of the crowd. He fired two shots in the air. Everyone scattered and began running away. The shooter pointed the gun at one of Houston's friends, shot, and missed. The shooter then looked at Houston. Houston turned and tripped on the curb. The shooter shot Houston in the leg, then approached, stood over him, and fired multiple shots at him. D.S. testified the only person he saw with a gun or weapon was the shooter.

The defendants, Wilson, and the shooter ran back to the SUV. They drove to the home of Shemita Cartwright, Henderson and Sullivan's sister, and Wilson's girlfriend. Police arrived some time later and apprehended defendants, but not the shooter. The black SUV was parked inside a closed garage. Police recovered cell

5

phones in the house; the call and message history had been deleted from each phone. Law enforcement was unable to locate the shooter.

### *Gang expert testimony*

The prosecution offered the testimony of two gang experts. The first expert explained that in gang culture, respect "is huge," and "a perceived act of disrespect can go anywhere from a verbal altercation to a shooting . . . at any second." He suggested that in a "territorial, South Central L.A. gang mentality," an incident or threat that disrespects the gang would have to be addressed. When presented with a hypothetical based on the facts of the case, the expert opined the brawl was a distraction that allowed the shooter to conduct a daytime execution that would benefit the gang.

The second gang expert testified about the Southside Compton Crips. He indicated they "associate with the color blue, sometimes black, blue and gold, because they'll often wear lettered attire, and . . . some of their attire is the Seattle Mariners' attire, where it would be blue and gold . . . you'll have a gold 'S' on a blue hat." He also opined that, based on a hypothetical similar to the facts of the case, he would conclude the shooting was gang-related. He further testified: "They left together, they came back together, they . . . left the scene together, and it's been in my experience over the years, gang members going to a rival area or against a rival, they're usually going to make sure—especially if they're going in another neighborhood—that they are protected and they have a weapon. And in all the cases that I can recall, the persons in the car are going back to commit the crime, with the early assault or the shooting, are aware that there is a weapon in the car."

Lockett also offered the testimony of a gang expert. In response to a hypothetical mirroring the facts of the case, the expert opined the cousin of the person invoking the Southside Crips gang name would not be associating for the benefit of the gang. He opined the facts represented a confrontation related to

6

family matters, and both groups appeared to have the expectation of merely a fight, with the exception of the shooter. The expert did indicate if the shooter was from the Southside Compton Crips, his opinion would be that the shooting was likely for the benefit of the gang. However, he further explained that the mere shouting of gang names does not automatically mean a person is "gang banging."

**Defense Evidence**

Lockett testified on his own behalf. According to Lockett, at the time of the incident, Henderson and Lockett were living in the same house. Henderson's girlfriend (also the mother of his child) asked him to pick up her sister, Moore. As Henderson and Lockett were leaving the house, Sullivan called and asked for a ride because his bicycle tires were flat. As the three defendants pulled up to Houston's house, Lockett could see that Houston was agitated. Lockett knew Houston; they had previously had an altercation in high school. However, they had not had any problems since, and Houston had been to Lockett's house multiple times. Moore was crying as she walked to the SUV. Houston approached to kiss the baby. D.S. was behind Houston. Sullivan tried to help Moore get the baby in the car. Lockett was sitting in the passenger seat. He did not know exactly what happened, but Henderson and D.S. ended up having an altercation. Houston and Sullivan exchanged words. Lockett got out of the car to let Sullivan out of the backseat. The exchange between Henderson and D.S. grew more heated. Coulter and Sullivan made gang references. Lockett did not intervene, because, as he explained: "I don't have anything to do with gangs, so I don't know. I don't want to say anything about it." He denied being a gang member or associating with gangs. He testified Sullivan was his cousin. Sullivan sometimes went to his mother's house, where Lockett was living, so "of course" Lockett hung out with him. But Lockett and Henderson were close and went everywhere together.

In Lockett's version of events, Sullivan told Houston they had not come to disrespect Houston's house. Houston, observing Henderson and D.S., said there would be no fighting right there. Instead, "If you wanna fight, you all drop my son off and come back in front of the apartments to fight." Once Lockett got back into the car, Henderson pointed to D.S. and said, "I'll be back for you." After they drove away, Sullivan said he was going to call someone. Henderson responded: "You don't have to call nobody, this between me and [D.S.]." Sullivan did not call anyone. The defendants dropped Moore off. They left again, with Lockett driving. Henderson called Wilson. Lockett thought Henderson was going to get Wilson and they were all going to a fight. Lockett went along because of Henderson. Once in the car, Wilson asked if they could pick up Wilson's cousin. Lockett responded that he did not put gas in the car and was "just the person with a valid license." Wilson directed them to a house where he met someone at the front door. He returned to the car with a man he introduced as his cousin Darren. Lockett did not see any weapons on Darren. There was no discussion of weapons. Everyone greeted Darren and introduced themselves. Lockett had never met Darren before.

Lockett drove to the designated location of the fight. He drove past Houston's group on the street because he did not realize it was them. However, there were people in the street flagging down the car. No one in the car made any statements relative to gangs, flashed gang symbols, made reference to having a gun, or mentioned weapons. There was talk of everyone fighting, if necessary. Lockett was going back for Henderson to fight D.S. If multiple guys tried to jump Henderson, Lockett was prepared to defend his cousin.

Lockett parked the car and everyone got out. Lockett did not talk to Darren. When they met Houston's group, Sullivan shook someone's hand. Sullivan asked, "How you guys wanna do this?" Henderson said he wanted to fight D.S. D.S. took off his shirt and began walking toward Henderson. Coulter

8

also walked toward Henderson, saying if he was fighting D.S., he would have to fight her. Henderson said he would not fight Coulter, indicating his mother had raised him "better than that," and he would not hit a woman. After that, everyone was in the middle of the street, some running around, some "squaring off," or preparing to fight, and some fighting. Lockett began looking for Henderson. Lockett was hit, or he tripped and fell. As he was getting up, he saw someone wearing a black hoodie run past. Shots rang out. Lockett was scared for his life, so he ran. He began to vomit. He made his way back to the SUV and handed the car keys to Sullivan. He thought the man in the black hoodie might have been the man Wilson brought, and he "didn't want any part of that." They all went to Lockett's cousin's house. No one spoke in the car. Lockett was scared. He again vomited. He saw Wilson tell Darren, "Let's go." The two left. Some time later the police arrived.

Lockett also offered the testimony of his cousin, Shemita Cartwright. Cartwright testified defendants, Wilson, and a fifth man wearing a black hoodie came to her house. She only saw the fifth man briefly before he left with Wilson. She had never seen him before. On cross-examination she testified that when she opened the door for the group, no one was saying anything, throwing up, screaming, or sweating, nor did they look nervous. She testified that the fifth man was not one of Wilson's two cousins she had seen before. She also admitted on cross-examination that during an interview with police on the day of the incident, she did not tell them that a fifth man wearing a black hoodie came to her house with defendants.

(Lodgment 7 at 2-9 (footnotes omitted).)

## IV.

## PETITIONER'S CLAIMS

Petitioner raises the following claims for habeas corpus relief:

9

1    (1) The jury necessarily convicted Petitioner of second degree murder based on a natural

2        and probable consequences theory but the evidence did not sufficiently support that

3        theory and the trial court erred by instructing the jury on such a theory without

4        sufficient evidence to warrant the instruction;

5    (2) Petitioner's conviction violated California state law authority and his punishment

6        amounted to cruel and unusual punishment; and

7    (3) California's second degree murder rule is void for vagueness.

## V.

## <u>STANDARD OF REVIEW</u>

**A.**    <u>**28 U.S.C. § 2254**</u>

The standard of review that applies to Petitioner's claims is stated in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> (d)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). If these standards are difficult to meet, it is because they were meant to be. As the United States Supreme Court stated in <u>Harrington v. Richter</u>,[7] while the AEDPA "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings[,]" habeas relief may be granted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with United States Supreme Court

---

[7] 562 U.S. 86, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011).

precedent.  Further, a state court factual determination must be presumed correct unless rebutted by clear and convincing evidence.[8]

**B.    Sources of "Clearly Established Federal Law"**

According to <u>Williams v. Taylor</u>,[9] the law that controls federal habeas review of state court decisions under the AEDPA consists of  holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision."  To determine what, if any, "clearly established" United States Supreme Court law exists, a federal habeas court also may examine decisions other than those of the United States Supreme Court.[10]  Ninth Circuit cases "may be persuasive."[11]  A state court's decision cannot be contrary to, or an unreasonable application of, clearly established federal law, if no Supreme Court decision has provided a clear holding relating to the legal issue the habeas petitioner raised in state court.[12]

Although a particular state court decision may be both "contrary to" and an "unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings under <u>Williams</u>.

A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts.[13]  If a state court decision denying a claim is "contrary to" controlling Supreme Court precedent, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)."[14]  However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."[15]

---

[8] 28 U.S.C. § 2254(e)(1).
[9] 529 U.S. 362, 412, 120 S. Ct. 1495, 146, L. Ed. 2d 389 (2000).
[10] <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.6 (9th Cir. 2000).
[11] <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).
[12] <u>Brewer v. Hall</u>, 378 F.3d 952, 955 (9th Cir. 2004); <u>see also</u> <u>Carey v. Musladin</u>, 549 U.S. 70, 77, 127, S. Ct. 649, 649, 166 L. Ed. 2d 482 (2006) (in the absence of a Supreme Court holding regarding the prejudicial effect of spectators' courtroom conduct, the state court's decision could not have been contrary to or an unreasonable application of clearly established federal law).
[13] <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam) (citing <u>Williams</u>, 529 U.S. at 405-06).
[14] <u>Williams</u>, 529 U.S. at 406.
[15] <u>Early</u>, 537 U.S. at 8.

11

State court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an <u>unreasonable</u> application' of clearly established federal law, or based on 'an <u>unreasonable</u> determination of the facts.'"[16] Accordingly, this Court may reject a state court decision that correctly identified the applicable federal rule but unreasonably applied the rule to the facts of a particular case.[17]  However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable" under <u>Woodford v. Visciotti</u>.[18]  An "unreasonable application" is different from merely an incorrect one.[19]

Where, as here with respect to Claim One, the California Supreme Court denied the claim without comment on direct review, the state high court's "silent" denial is considered to be "on the merits" and to rest on the last reasoned decision on this claim.  In the case of Claim One, this Court looks to the grounds the California Court of Appeal stated in its decision on direct appeal.[20]

Where, as here with respect to Claims Two and Three, the state courts have supplied no reasoned decision for denying the petitioner's claims on the merits, this Court must perform an "'independent review of the record' to ascertain whether the state court decision was objectively unreasonable."[21]

**VI.**

**<u>DISCUSSION</u>**

A.    **<u>Sufficiency of the Evidence</u>**

    1.    **<u>Background</u>**

In Claim One, Petitioner argues the jury necessarily convicted him of second degree murder based on a natural and probable consequences theory but such a theory was not

---

[16] <u>Id.</u> at 11 (citing 28 U.S.C. § 2254(d)).
[17] <u>See</u> <u>Williams</u>, 529 U.S. at 406-10, 413.
[18] 537 U.S. 19, 27, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).
[19] <u>Williams</u>, 529 U.S. at 409-10.
[20] <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-06, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991).
[21] <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003) (citing <u>Delgado v. Lewis</u>, 223 F.3d 976, 981-82 (9th Cir. 2000)).

12

1   supported by the evidence because: 1) the evidence did not establish that the shooter was a
2   participant in the target crimes of assault and battery related to the fistfight and 2) the murder
3   was not a reasonably foreseeable consequence of the fistfight. Petitioner further argues that the
4   trial court erred by issuing a natural and probable consequences instruction because the evidence
5   did not support the theory. (Petition at 10-20.)[22]

6   **2.    State Court Opinion**

7   The California Court of Appeal denied Petitioner's claim, as follows:

8       Defendants advance two arguments. First, they contend the evidence was
9   insufficient for the jury to conclude the shooter was a participant in the intended
10  crime of assault and battery. Second, they argue that even if the jury could
11  properly find the shooter was a co-participant, there was insufficient evidence to
12  support the conclusion that Houston's murder was a reasonably foreseeable
13  consequence of the intended assault and battery. We reject both arguments.

14  **i. The evidence was sufficient for the jury to conclude the shooter**
15  **aided and abetted the assault and battery**

16      The shooter did not have to directly participate in the target assault and
17  battery for the natural and probable consequences doctrine to apply. "The statutes
18  and, accordingly, the natural and probable consequence doctrine, do not
19  distinguish among principals on the basis of whether they directly or indirectly
20  aided and abetted the target crime, or whether they directly or indirectly aided and
21  abetted the perpetrator of the nontarget crime. An aider and abettor of the target
22  crime is guilty of any crime that any principal in that target crime commits if it
23  was a natural and probable, i.e., reasonably foreseeable, consequence of the target
24  crime." (*Smith, supra,* 60 Cal.4th at p. 613.)

25      In other words, if the evidence was sufficient for the jury to conclude the
26  shooter aided and abetted the assault and battery, it could properly determine
27  whether the subsequent crime he committed—murder—was a natural and

28

[22] This Court refers to the pages of the Petition as assigned by the electronic docketing system.

probable consequence of the assault and battery, thus implicating the other defendants. We conclude the evidence was sufficient for the jury to find the shooter was an aider and abettor in the assault and battery.

"Aider-abettor liability exists when a person who does not directly commit a crime assists the direct perpetrator by aid or encouragement, with knowledge of the perpetrator's criminal intent and with the intent to help him carry out the offense. [Citation.] '[W]hile mere presence at the scene of an offense is not sufficient in itself to sustain a conviction, it is a circumstance which will tend to support a finding that an accused was a principal. [Citations.]' [Citation.] ' "[C]ompanionship, and conduct before and after the offense" ' are also relevant to determining whether a defendant aided and abetted a crime. [Citations.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 407.)

In this case, the evidence established that after the defendants dropped off Moore and her baby, they drove away with the singular purpose of going back to fight Houston and his family. The jury could reasonably infer defendants picked up both Wilson *and* the shooter to assist in the fight or, at a minimum, as backup.

Even if the jury credited portions of Lockett's testimony, it could draw a reasonable inference from his testimony that picking up the shooter had a purpose related to the impending brawl. Lockett testified that everyone in the car discussed fighting and being prepared to fight. Once defendants parked the SUV, the shooter got out of the car and accompanied defendants to meet Houston's group. The jury could interpret this as displaying an intent to help defendants carry out the assault and battery. While there was evidence the shooter to some extent "lagged" behind defendants, he was perceived as being with them as the two groups met and prepared to fight, further suggesting he shared their intent to engage in an assault and battery. (*People v. Le Grant* (1946) 76 Cal.App.2d 148, 156, abrogated on another ground as stated in *People v. Cox* (2000) 23 Cal.4th 665, 675.) Moreover, the shooter's act of firing two shots in the air could be

14

interpreted as aiding and abetting the assault, and further establishing the shooter's participation in the target crime. In addition, after the shooting, the shooter rode away in the SUV with the defendants.

This evidence was sufficient for the jury to conclude beyond a reasonable doubt that, rather than being a lone wolf unattached to defendants' plans for a brawl, the shooter aided and abetted the assault and battery as backup or as a reinforcement. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409-410 [defendant did not just happen by the scene of the crime; he was not surprised by perpetrator's conduct and jury could infer his presence was meant to intimidate, divert suspicion, and watch out for others].) "An aider and abettor is someone who, with the necessary mental state, 'by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*Smith, supra,* 60 Cal.4th at p. 616.) Here, the shooter did not just show up to the brawl. He came with the defendants, and the jury could reasonably infer that he knew the defendants would engage in assault and battery, he intended to facilitate that offense, and, both with his presence and by acting as backup, he aided and encouraged the commission of the assault and battery. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1129; *People v. Prettyman* (1996) 14 Cal.4th 248, 259.)

**ii. Substantial evidence supported a conclusion that second degree murder was a natural and probable consequence of the assault and battery**

The evidence was also sufficient to support a finding that second degree murder was a natural and probable consequence of the assault and battery in this case. As explained above, a principal in the target crime is liable for the crime committed by another principal in the target crime, if that nontarget offense is a natural and probable consequence of the intended crime. "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable. [Citation.]

15

. . . Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*Chiu, supra,* at pp. 161-162.)

Here, there was evidence defendants sought out a confrontation with Houston's group. They picked up two additional men as backup, including the shooter. Although the jury rejected the allegation that the murder was committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further and assist in criminal conduct by gang members, it could still properly consider that during the argument that precipitated the brawl, Sullivan invoked a gang name, and Coulter responded with a purported association with members of a rival gang. Even though of the assembled individuals, only Sullivan was a known gang member, Sullivan and Coulter deliberately injected gangs into the dispute. There was evidence that Sullivan said he would have to call one of his "homies" to report he "got into it" with someone from a rival gang. The defendants then picked up Wilson, a relative, and the shooter, who was wearing at least one color associated with Sullivan's gang. The jury could reasonably infer the shooter was Sullivan's fellow gang member. Although Henderson drove the SUV to pick up Moore initially—in his step-father's vehicle—on the way back to the confrontation, Lockett drove the SUV. He testified he responded to Wilson's request to pick up the shooter by saying he was just the person with a valid license. The prosecutor argued this detail indicated the defendants knew there was a gun in the car, and therefore they wanted to exercise additional caution in case they were stopped by the police. The jury could reasonably have accepted this inference.

Thus, defendants returned to have a violent confrontation with Houston's group. They were prepared to fight, and they increased their numbers by bringing along Wilson and the shooter. Gang names and affiliations had been invoked by one person on each side of the dispute. Even if the defendants did not go to the brawl intending to kill anyone, under all the circumstances presented, a jury could

16

find that a reasonable person in the defendants' position would have or should have known a murder was a reasonably foreseeable consequence of the assault and battery.  (*People v. Medina* (2009) 46 Cal.4th 913, 926.)

As both sides have recognized, numerous courts have identified circumstances in which murder was a natural and probable consequence of an assault or battery.  The defendants also point out that many of these cases involve confrontations between gang members, therefore, unlike the case at bar, the jury could consider the well-known violent behavior of gangs when determining whether murder was a foreseeable consequence of the target crime.  (See *Smith, supra,* 60 Cal.4th at pp. 619-620 [murder a foreseeable consequence from gang-related assault or battery or disturbing the peace]; *People v. Medina, supra,* 46 Cal.4th at pp. 920-923 [collecting cases and concluding shooting was a reasonably foreseeable consequence of the gang assault]; *People v. Miranda, supra,*192  Cal.App.4th at pp. 409-410 [jury could reasonably conclude defendant knew there were firearms in the car and that a fellow gang member would likely use one of them in the commission of a gang-related robbery]; *People v. Ayala* (2010) 181 Cal.App.4th 1440, 1451 [even if jury believed defendant was ignorant of a gun, it could still find murder to be a foreseeable consequence of violent gang confrontation]; *People v. Montes* (1999) 74 Cal.App.4th 1050, 1055 [case was a "textbook example of how a gang confrontation can easily escalate from mere shouting and shoving to gunfire"]; *People v. Godinez* (1992) 2 Cal.App.4th 492, 500 [based on evidence at trial including gang expert testimony, and "the common knowledge that an unfortunate reality of modern times is that gang confrontations all too often result in death," jury could find homicide a reasonably foreseeable consequence of assault]; see also *People v. Gonzales* (2001) 87 Cal.App.4th 1, 11 [evidence that defendants (gang members) ran to fight with rival gang members and one defendant was visibly armed; even without testimony

17

of expert on gangs there was substantial evidence to support a finding murder was a natural and probable consequence of the fight].)

In arguing the evidence was insufficient, defendants cite these cases and focus on the jury's not true finding on the gang allegation. They assert that in the absence of a true finding on the gang enhancement, there was no evidence from which the jury could conclude that a dispute involving only personal animosity would foreseeably lead to murder, or from which the jury could infer the defendants knew or should have known the shooter was armed.

However, while the above cases involved gang confrontations, the underlying principles informing the reasoning are not limited to crimes found to be committed for the benefit of a gang. Instead, the gang evidence was *a factor* that could be considered by the jury to conclude it was reasonably probable a target crime would lead to a homicide. Moreover, courts have affirmed jury findings of murder based on the natural and probable consequences theory in other types of cases as well. For example, in *People v. Guillen* (2014) 227 Cal.App.4th 934, multiple defendants—prison inmates—participated in a coordinated attack on the victim, also an inmate, in the belief that he was a child molester. There was evidence the defendants knew the beating would go beyond the normal "taxing" that occurs in prison, and many of the inmates were eager to participate. The beating was prolonged, lasting around 30 minutes. Between 30 and 50 inmates participated. (*Id.* at p. 995.) The court upheld a jury verdict finding the defendants guilty of second degree murder, concluding "there was sufficient evidence to conclude a reasonable person in [the defendants' position] would know murder was a natural and probable consequence of battery and assault with force likely to produce great bodily injury within jail culture." (*Id.* at p. 996.)

Similarly, in a much earlier case, a court upheld murder convictions arising out of a planned assault that turned into a fatal bludgeoning. In *People v.*

18

*King* (1938) 30 Cal.App.2d 185, 200-201, the court rejected the argument that a homicide was not a natural and probable consequence of a planned assault, even as to two participants who were not present during the actual murder. The court explained: "Here, several men set out to beat up another. In the words of [one defendant], he 'sent them over to tamp the chief.' Preparations were made for trouble. It was known that [the victim] was vigorous and strong. One [man involved in the beating], at least, prior to setting out on the expedition, equipped himself with a bludgeon. At the scene of the expected trouble others were asked to stand by. Not being able to get at the victim the first day, the majority returned the second day and proceeded to the victim's place of abode aboard ship. They prepared, and were prepared, to meet force with force and to overcome resistance at any cost. The natural and probable consequence of such an undertaking is homicide, and the homicide here committed by one of the conspirators is nothing less than murder." (*Id.* at pp. 200-201.)

The evidence in this case is similar. Although the initial argument appears to have been trivial, the defendants took it seriously and warned they would return. The brawl was not an ambush, as in *King,* but the defendants set out to fight Houston and those with him. They picked up two additional men for backup or additional fighting power. While the jury found the crime in this case was not committed in association with, for the benefit of, or at the direction of a criminal street gang, it could still have believed tensions were heightened as the result of Sullivan and Coulter invoking gang names during the altercation that precipitated the dispute. Further, to the extent the jury inferred the shooter was a gang member, it could reasonably conclude that when defendants brought a gang member to fight, it was then reasonably foreseeable that the gang member would escalate the anticipated violence into a deadly confrontation, even without any express knowledge that the gang member was armed. There was sufficient evidence to conclude a reasonable person in defendants' position would know

19

murder was a natural and probable consequence of battery and assault under the circumstances of this case.

In sum, substantial evidence supported a jury finding that the shooter was a principal in the target assault and battery, and that the murder he committed was a reasonably foreseeable consequence of the assault and battery perpetrated against Houston and his associates. We accordingly reject the argument that the trial court should not have instructed the jury on the natural and probable consequences doctrine. (*People v. Campbell, supra,* 25 Cal.App.4th at p. 408.) Substantial evidence supported the application of this theory of liability to this case.

(Lodgment 7 at 12-19 (footnotes omitted).) Because the state court found sufficient evidence to support Petitioner's conviction under a natural and probable consequences theory, it further found the trial court did not err by issuing the related jury instructions. (Lodgment 7 at 19 n.11.)

### 3. Legal Standard

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."[23] In Jackson v. Virginia,[24] the United States Supreme Court announced the federal standard for determining the sufficiency of the evidence to support a conviction. Under Jackson, "[a] petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."[25] The Supreme Court has held that "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[26] "Put another way, the dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"[27]

---

[23] In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970).
[24] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).
[25] Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).
[26] Jackson, 443 U.S. at 319.
[27] Chein v. Shumsky, 373 F.3d 978, 982-83 (9th Cir. 2004) (en banc) (quoting Jackson, 443 U.S. at 318).

When the factual record supports conflicting inferences, the federal court must presume, even if it does not affirmatively appear on the record, that the trier of fact resolved any such conflicts in favor of the prosecution, and the federal court must defer to that resolution.[28] Additionally, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction."[29]

The Jackson standard applies to federal habeas claims attacking the sufficiency of the evidence to support a state conviction.[30]  In addition, the AEDPA requires the federal court to "apply the standards of Jackson with an additional layer of deference."[31]  The federal court must ask "whether the decision of the California Court of Appeal reflected an 'unreasonable application' of Jackson and Winship to the facts of this case."[32]

The federal court must refer to state law to define the substantive elements of the criminal offense and determine what evidence is necessary to convict on the crime charged.[33]

### 4.  **Analysis**

#### a.  **Shooter's Participation**

First, the evidence was sufficient to support the jury's finding that the shooter participated in the fistfight as an aider and abettor.

Under California law, a person is guilty of aiding and abetting if "he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime."[34]  "A person who aids and abets the commission of a crime is a 'principal' in the crime, and thus shares the guilt of the actual perpetrator."[35]

---

[28] Jackson, 443 U.S. at 326.
[29] Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).
[30] Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).
[31] Juan H., 408 F.3d at 1274.
[32] Id. at 1275 & n.13.
[33] Jackson, 443 U.S. at 324 n.16; Juan H., 408 F.3d at 1275.
[34] People v. Beeman, 35 Cal.3d 547, 561 (1984).
[35] People v. Smith, 60 Cal.4th 603, 611 (2014) (internal quotation marks and citation omitted).

1    Here, Petitioner and his group left the victim's house with the promise of returning to

2    confront the victim.  (2 RT at 1282-83; 3 RT at 1859-61, 1916, 2450.)  After leaving the victim's

3    house, Petitioner said he "need[ed] to call one of [his] homies an' tell 'em [he] just got into it

4    with a nigga from 190."  (3 RT at 2451.)  On the way to confront the victim a second time,

5    Petitioner and his group picked up two more men, including the shooter.  (5 RT at 4051, 4053.)

6    The group discussed their plan to engage in a fight.  (5 RT at 4055.)  The shooter, knowing he

7    was armed with a gun, rode along with the group and accompanied them to the location of the

8    fight.  (2 RT at 1289, 1291-92; 3 RT at 1919, 2482-83, 2509; 5 RT at 4054-56.)  Then as the

9    fistfight was in full motion, the shooter came out from a hiding spot firing his weapon at the

10   victim and his companions.  (2 RT at 1298-99, 1305; 3 RT at 2412, 2491.)

11       This evidence, viewed in the light most favorable to the judgment, allowed the jury to

12   reasonably infer that the shooter knew of the group's purpose to fight the victim, intended to

13   encourage the commission of the fistfight, and by act or advice aided, promoted, or encouraged

14   the fistfight.

15                    b.        **Natural and Probable Consequence**

16       The evidence was also sufficient to support the jury's finding that murder was a natural

17   and probable consequence of the fistfight.

18       California law states that "[a]n aider and abettor is guilty not only of the intended, or

19   target, crime but also of any other crime a principal in the target crime actually commits (the

20   nontarget crime) that is a natural and probable consequence of the target crime."[36]  The

21   California Supreme Court explained in <u>Smith</u> the test for determining whether a nontarget crime

22   is a natural and probable consequence for aider and abettor liability:

23       A consequence that is *reasonably foreseeable* is a natural and probable consequence

24   under this doctrine.  A nontarget offense is a natural and probable consequence of the target

25   offense if, judged objectively, the additional offense was reasonably foreseeable.  The inquiry

26   does not depend on whether the aider and abettor actually foresaw the nontarget offense.  Rather,

27   liability is measured by whether a reasonable person in the individual's position would have or

28

[36] <u>Id.</u>

22

should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.[37]

Here, Petitioner challenged the victim and his family with Petitioner's gang affiliation and, in return, the victim's sister claimed to have ties to the 190 gang. Petitioner then stated that his gang did not get along with the 190 gang and that members of the 190 gang had "just killed" a member of Petitioner's gang. (2 RT at 1281, 1346-47; 3 RT at 1852, 1916; 5 RT at 4048.) After Petitioner's group left the victim's house, Petitioner stated that he needed to call his "homie" and tell him he had been confronted by someone from the 190 gang. (3 RT at 2451.) Petitioner and four other men then sought out the victim for the purpose of confronting him and getting into a fight. Petitioner appeared to take a leadership role before the fight, asking how the group was going to handle the fight. (2 RT at 1300; 3 RT at 1865-66, 14892; 5 RT at 4056.) Under such heated and gang-influenced circumstances, a reasonable person in Petitioner's position would have or should have known that murder was a foreseeable consequence of a group fistfight.[38]

Significantly, the fact that the jury found the gang allegations not true does not change this conclusion. By rejecting the gang allegations, the jury found that the crime did not meet the state law requirements for proving Petitioner committed the crime "for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further and assist in criminal conduct by gang members." (4 SCT at 683 (citing Cal. Penal Code § 186.22(b)(4).) However, the jury's finding on the gang allegation did not preclude the jury from finding that there was a gang element to Petitioner's involvement in the crime that did not rise to the level of satisfying the elements of the gang allegations.

---

[37] Id.

[38] People v. Medina, 46 Cal.4th 913, 922-23 (2009) (evidence sufficient to support murder conviction on natural and probable consequences theory where defendant and fellow gang members issued gang challenge and engaged in fistfight with victim, after which one of defendant's fellow gang members shot at victim's car as victim was attempting to leave fight, killing victim); People v. Hoang, 145 Cal.App.4th 264, 270 (2006) (upholding conviction for attempted premeditated murder as a natural and probable consequence of assault with a deadly weapon, where defendant went to strip mall with gang members in response to a call from his girlfriend relating that someone had insulted her, verbally challenged victim just before victim was stabbed, and left scene quickly without summoning medical assistance for victim); People v. Montes, 74 Cal.App.4th 1050, 1056 (1999) (evidence supported determination that attempted murder was natural and probable consequence of target offenses of assault and fighting in public, regardless of whether defendant knew perpetrator was armed).

23

Finally, because the evidence supported Petitioner's conviction under a natural and probable consequences theory, the trial court did not err by instructing the jury on such a theory.

Because the evidence supported a finding that the shooter was an aider and abettor to the fistfight and that the murder was a natural and probable consequence of the fight, this Court finds that the California courts' denial of Petitioner's sufficiency of the evidence claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court. Habeas relief is not warranted on Claim One.

**B.    State Law Error**

In the first part of Claim Two, Petitioner argues his conviction is contrary to the California Supreme Court's holding in People v. Banks.[39]  (Petition at 20-24.)  Petitioner's claim rests in state law only.  However, federal habeas corpus relief is not available for errors of state law.[40]  Thus, Petitioner's claim is not cognizable here.

**C.    Cruel and Unusual Punishment**

**1.    Background**

In the second part of Claim Two, Petitioner argues his sentence of 17 years to life was disproportionate to his culpability for engaging in a fistfight, and, thus, his sentence violates the Eighth Amendment's protection against cruel and unusual punishment.  (Petition at 24-31.)

**2.    Legal Standard**

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'"[41]  In evaluating an Eighth Amendment claim challenging a sentence for a term of years, "[a] gross disproportionality principle" applies.[42]  The "precise contours" of the principle are "unclear"; however, they apply "only in the 'exceedingly rare' and 'extreme' case."[43]  In considering a gross disproportionality claim, courts must objectively measure the severity of the sentence in

---

[39] 61 Cal.4th 788 (2015).
[40] Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991).
[41] Ewing v. California, 538 U.S. 11, 20, 123 S. Ct. 1179, 155 L. Ed. 2d 108 (2003) (plurality opinion).
[42] See Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).
[43] Andrade, 538 U.S. at 73; Harmelin v. Michigan, 501 U.S. 957, 1001, 111 S. Ct. 2680, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring).

24

light of the crimes committed.[44]  Applying these principles, courts have held "it is clear that a

mandatory life sentence for murder does not constitute cruel and unusual punishment."[45]

Generally, so long as a sentence does not exceed statutory maximums, it will not be considered

cruel and unusual punishment under the Eighth Amendment.[46]

### 3.    Analysis

Petitioner's sentence did not exceed the statutory maximums under state law.  Thus, his

sentence does not violate the Eight Amendment.  Moreover, Petitioner fails to demonstrate that

his is one of the exceedingly rare cases in which the sentence imposed raises an inference of

gross disproportionality when compared to the very serious crime committed, particularly in

light of precedent finding no Eighth Amendment violation where lengthy prison sentences were

imposed for less serious crimes.[47]

For all these reasons, this Court finds that the California courts' denial of Petitioner's

claim was neither contrary to, nor involved an unreasonable application of, clearly established

federal law, as determined by the United States Supreme Court.  Habeas relief is not warranted

on Claim Two.

## D.    Void for Vagueness

In Claim Three, Petitioner argues that California's second degree felony murder rule is

unconstitutionally vague based on the United States Supreme Court decision in Johnson v.

United States.[48]  (Petition at 31-40.)

In Johnson, the Supreme Court held that imposing an increased sentence under the

"residual clause" of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. section 924(e),

---

[44] Norris v. Morgan, 622 F.3d 1276, 1287 (2010).

[45] United States v. LaFleur, 971 F.2d 200, 211 (9th Cir. 1991) (citing Harmelin, 501 U.S. 957).

[46] See United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998); United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990).

[47] See Harmelin, 501 U.S. at 1009 (Kennedy, J., concurring) ("[P]etitioner's sentence of life imprisonment without parole for his crime of possession of more than 650 grams of cocaine does not violate the Eighth Amendment."); Rummel v. Estelle, 445 U.S. 263, 265, 100 S. Ct. 1133, 63 L. Ed. 2d 382 (1980) (mandatory life sentence under recidivist statute where defendant suffered three theft related offenses does not constitute cruel and unusual punishment); United States v. Major, 676 F.3d 803, 812 (9th Cir. 2012) (sentences of almost 750 years for various robbery and firearm offenses did not constitute cruel and unusual punishment); LaFleur, 971 F.2d at 211 ("Under Hamelin, it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment.").

[48] --- U.S. ----, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015).

violates due process because that clause is unconstitutionally vague.[49]  However, <u>Johnson</u> did not purport to address California law.  Thus, <u>Johnson</u> does not provide clearly established Supreme Court precedent upon which Petitioner would be entitled to relief.

Moreover, although a court in this district has held that "there appears to be at least a colorable argument that the rationale underlying the decision in <u>Johnson</u> could be applied to California's second-degree felony-murder rule,"[50] Petitioner was not convicted under California's felony murder rule.  By his own admission, Petitioner was convicted of second degree murder as an aider and abettor.  (Petition at 14.)  Consequently, to the extent Petitioner could show <u>Johnson</u> rendered California's felony murder rule void, it would not entitle Petitioner to relief.

Accordingly, this Court finds that the California courts' denial of Petitioner's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court.  Habeas relief is not warranted on Claim Three.

**VII.**

**<u>RECOMMENDATION</u>**

IT THEREFORE IS RECOMMENDED that the District Court issue an Order:  (1) approving and accepting this Final Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

DATED: ___September 25, 2018___     _____
HONORABLE LOUISE A. LA MOTHE
united States Magistrate Judge

---

[49] <u>See id.</u> at 2555-57 ("residual clause" in ACCA which defines a "violent felony" to include "conduct that presents a serious potential risk of physical injury to another" denies fair notice to defendants of what conduct is included and invites arbitrary enforcement).

[50] <u>Renteria v. Asunsion</u>, No. CV 16-6874-R (FFM), 2016 WL 7336558, at *3 (C.D. Cal. Dec. 16, 2016).